# In the United States Court of Federal Claims

No. 08-910

(Filed: November 20, 2012)

* * * * * * * * * * * * * * * * * * * *

MARIA TOSCANO, MARCOS
TOSCANO, CYNTHIA WEBSTER,
AND LITTLEHORN PROPERTIES,
LC, for themselves and others similarly
situated,

            *Plaintiffs*,

v.

THE UNITED STATES,

            *Defendant*.

Constitutional Takings; Rails-to-Trails Act; Construction of Deeds; "State of Maine Transaction"; Apportionment of Easement; Extinguishment of Entire Easement; Valuation of Interest Taken.

* * * * * * * * * * * * * * * * * * * *

    *Steven M. Wald,* St. Louis, Mo., for plaintiffs.

    *E. Barrett Atwood*, United States Department of Justice, Civil Division, Washington, DC, with whom was *Ignacia Moreno*, Assistant Attorney General, for defendant.

_____

OPINION

_____

BRUGGINK, *Judge*.

    This is a class action brought by Utah landowners who assert that the imposition of a recreational trail on their land constitutes an uncompensated taking under the Fifth Amendment of the United States Constitution. Plaintiffs contend that, but for the Surface Transportation Board's ("STB") issuance of a Notice of Interim Trail Use pursuant to section 8(d) of the National Trails System Act, 16 U.S.C. § 1247(d) (2006) (the "Trails Act"), they would have had full use of the surface of their property, because the easements supporting the railroad line would have been extinguished by operation of state law. We

1

certified the class in 2011. *Toscano v. United States*, 98 Fed. Cl. 152 (2011). Pending are the parties' cross-motions for summary judgment and plaintiffs' motion to dismiss the claims of certain plaintiffs. The matter is fully briefed, and we heard oral argument on July 11, 2012. The parties subsequently filed supplemental proposed findings of fact and a stipulation. For the reasons set out below, we grant in part and deny in part plaintiffs' motion for partial summary judgment on liability and grant plaintiffs' motion for partial summary judgment on the proper methodology to determine the amount of just compensation. We grant plaintiffs' motion to dismiss certain plaintiffs' claims, although we do so with prejudice. We grant in part and deny in part defendant's cross-motion for summary judgment.

BACKGROUND

Plaintiffs own real estate in Weber and Davis Counties, Utah, that underlies or abuts an approximately 24 mile long railroad right-of-way. This right-of-way was owned, as of 2002, by Union Pacific Railroad Company ("Union Pacific"), whose predecessor in interest acquired the rights-of-way through five different instruments in the 1880's. The parties were able to stipulate that four of these, the Forbes Condemnation, the Hooper Condemnation, the Smith Condemnation, and the Williams Deed, all conveyed easements to Union Pacific which were limited to railroad purposes. The parties were unable to agree as to the nature of the grants acquired by the railroad through a State of Utah Patent. Plaintiffs contend that the latter instrument created an easement for railroad purposes only. Defendant contends that the easement was for a general right-of-way, which might permit recreational trail use.

Unlike many other Rails-to-Trails cases this court has heard recently, this one has a unique history, and one which the United States believes leads to no taking. The relinquishment of Union Pacific's common carrier obligations was preceded by a sale of all but a portion of the railroad's interest in the easement. The process began on January 17, 2002, with execution of a "Purchase and Sale Agreement Between Union Pacific Railroad and Utah Transit Authority" ("Agreement"). The Utah Transit Authority ("UTA") is a public transit district under Utah law.[1] Under the terms of the Agreement,

---

[1] UTA was created under the authority of a statute originally codified in 1969. *See Weiser v. Union Pacific R.R. Co.*, 247 3d 357, 369 & n.5 (citing Utah Code. Ann. §§ 11-20-1 *et seq.* (1969)).

Union Pacific sold all of its interest in the right-of-way at issue,[2] subject to its retention of "an exclusive easement for freight railroad purposes upon, over, under and across the Section 3.2 Properties, as more particularly provided in the Quitclaim Deed(s)." Def.'s Pr. Findings Ex. 2 at US000478.[3] In effect, Union Pacific split its interest in two: it transferred to UTA the entire easement along with physical improvements it had built, including the right to operate "possible" passenger service, but it retained for itself the right to conduct a freight line, the extent of which would be defined more clearly in the quitclaim deeds.

On January 28, 2002, UTA filed a notice of exemption with the STB, the federal agency with responsibility for, among other things, regulating and licensing common carrier train service. The filing gave notice of the Agreement but simultaneously asserted that the STB did not have jurisdiction to approve or disapprove the Agreement because the only aspect of service on the line over which the STB would otherwise have jurisdiction, freight service, was specifically omitted from the sale. Union Pacific was retaining those obligations. On May 22, 2002, the STB issued a decision dismissing the notice, in effect endorsing UTA's position that the sale was beyond its jurisdiction. The parties refer to this two-step process of splitting the right-of-way and obtaining the agreement of the STB that it is immune from STB jurisdiction as a "State of Maine transaction," named after the state in which a ruling by the Interstate Commerce Commission, predecessor agency to the STB in this respect, first endorsed the practice. *See* discussion *infra* page 9.

On September 16, 2002, the railroad consummated the Agreement with UTA by executing two quitclaim deeds. One deed transferred the property in Weber County, and the other deed transferred the property in Davis County. Def.'s Supplemental Pr. Findings Ex. 7 (Weber); Def.'s Supplemental Pr. Findings Ex. 8 (Davis).[4] The freight easement retained by Union Pacific in

---

[2] A number of segments other than the 24 miles at issue here were included in the purchase and were also included in subsequent actions before the STB.

[3] "Def.'s Pr. Findings" refers to United States' Response to Plaintiffs' Proposed Findings of Uncontroverted Facts and the United States' Proposed Findings of Uncontroverted Facts.

[4] "Def.'s Supplemental Pr. Findings" refers to United States' Unopposed Motion to Supplement Its Cross-Motion for Summary Judgment

each instrument, however, was a slice from the middle of the underlying easements. It was limited to the following area:

> only the portion of the Property located within twelve and one-half feet (12.5') on either side of the center line of the railroad tracks on the Property . . . and the right to construct, maintain and operate freight rail sidings and related facilities upon, all other portions of the Property as reasonably necessary for [Union Pacific's] use and enjoyment of the [Freight] Easement.

Def.'s Supplemental Pr. Findings Ex. 7 at US002662; *see also* Def.'s Supplemental Pr. Findings Ex. 8 at US002682. In other words, the retained freight easement was 25 feet wide on center, while the underlying easement that was transferred was either 66 or 100 feet wide.

Union Pacific thereafter filed a notice of exemption with the STB, seeking authority to abandon its common carrier obligations with respect to the railroad line. In a decision on December 2, 2002, the STB agreed to the abandonment exemption. The decision noted that the "physical assets of the line, including the real property interests and track structure" were previously sold to UTA and that Union Pacific had only "retained an exclusive perpetual easement and common carrier obligation on the line to conduct freight operations." Def.'s Pr. Findings Ex. 6 at US00105 n.1. The STB decision noted that this "retained easement will expire upon consummation of the instant abandonment exemption." *Id.*

UTA subsequently filed with the STB a request for issuance of a Notice of Interim Trail Use ("NITU") for the railroad line that from "[Mile Post] 754.31 near Valencia [to] approximately [Mile Post] 778.00 near Ogden." Pls.' Pr. Findings Ex. K at 1.[5] UTA's letter notified STB that it "seeks rail banking and interim trail use on the Subject Line" and that it would take responsibility for the management, liability, and fees that attended "the right-

---

and Proposed Findings of Uncontroverted Facts.

[5] "Pls.' Pr. Findings" refers to Plaintiffs' Proposed Findings of Uncontroverted Facts in Support of Their Motion for Partial Summary Judgment on Liability and Proper Methodology to Determine the Amount of Just Compensation.

of-way owned by Utah Transit Authority and operated by Union Pacific Company." *Id.* at 2. The letter made no distinction as to what part of the easement would be converted to trail use; it merely referred without specificity to the "Subject Line" and the "right-of-way."

The STB issued the NITU on December 31, 2002, pursuant to authority granted by section 8(d) of the Trails Act. 16 U.S.C. § 1247(d). This decision prevented the notice of exemption of Union Pacific's freight easement from going into effect. It "modified [the exemption] to the extent necessary to implement trail use/rail banking." *Id.* The result was that, so long as UTA negotiated the right to operate a trial on the Union Pacific easement, the abandonment exemption would not go into effect. If no trail use agreement was reached between the two parties within the prescribed 180-day period, then Union Pacific would "fully abandon the line." But for the NITU, the railroad's right to operate would have ended.

On January 1, 2003, Union Pacific granted UTA the option to buy from it "the right to reactivate said line of railroad for freight rail service or freight railroad purposes." Def.'s Pr. Findings Ex. 1 at US000418. From the parties' briefs, it appears that this option was "executed." Def's Reply in Supp. of Pr. Findings ¶ 20.[6] In effect, the railroad's original, undivided easement was once again reassembled in the hands of UTA–the temporary splitting into a freight and non-freight easement merely having served the purpose of exempting the initial Agreement from STB oversight.

Union Pacific thereafter sent a letter to STB on March 13, 2003, noting that the parties had completed a trail use agreement for the right-of-way "from [Mile Post] 754.31 near Valencia to [Mile Post] 778.00 near Ogden." Pls.' Pr. Findings Ex. L at 1. The collective effect of these transactions was that the entirety of the easement was merged into the ownership of UTA and that abandonment by the railroad was forestalled because of the interim trail use agreement.

DISCUSSION

The STB has jurisdiction over common carrier train service. Railroads, such as Union Pacific here, must obtain approval of the STB if they wish to

---

[6] "Def.'s Reply in Supp. of Pr. Findings" refers to United States' Reply in Support of Its Proposed Findings of Uncontroverted Facts.

terminate their common carrier obligations. An operator files an application for abandonment pursuant to 49 U.S.C. §§ 10903 and 10904 (2006), *amended by* Pub. L. No. 112-141, 126 Stat. 405 (2012), or a petition for exemption pursuant to 49 U.S.C. § 10502 (2006). If the line to be abandoned is operated on a railroad easement, then typically, under state law, the underlying landowner's right to immediate use of the surface would be triggered upon approval of abandonment by the STB. The prior easement comes to an end either by abandonment or because it is extinguished by misuse. The Trails Act interferes with the normal operation of state law, however. It permits the preservation of those easements for possible future railroad use, despite what state law would otherwise dictate in terms of extinguishment of the easement. *Presault v. Interstate Commerce Comm'n*, 494 U.S. 1, 5 (1990) ("*Presault I*"). The mechanism by which this is accomplished "is a STB order (a NITU) staying railroad abandonment during the pendency of trail use." *Barclay v. United States*, 443 F.3d 1368, 1371 (Fed. Cir. 2006). The NITU keeps the abandonment or exemption from going into effect while affording an opportunity to a third party to negotiate a trail use agreement with the railroad. *See* 49 C.F.R. § 1152.29(b)(2) & (d) (2012).

If the parties enter into a trail use agreement, the railroad corridor becomes "railbanked," and trail use is allowed to continue indefinitely pursuant to the NITU. *Barclay*, 443 F.3d at 1371. The Trails Act directs that "such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). The federal government therefore "burdens and defeats the property interest[s]" that may belong to the underlying property owners under state law. *Presault I*, 494 U.S. at 23 (O'Connor, J., concurring). An interference with "state law reversionary property interests" is a taking of private property that requires just compensation under the Fifth Amendment. *See Caldwell v. United States*, 391 F.3d 1226, 1228-29 (Fed. Cir. 2004).[7]

The taking occurs at the execution of the NITU because "[t]he NITU marks the 'finite start' to either temporary or permanent takings claims by halting abandonment and the vesting of state law reversionary interests when issued." *Id.* at 1235. In the event there is no trail agreement, the application or exemption receives approval, the STB jurisdiction over the railroad right-of-

---

[7] This is not a true reversionary interest, but merely the right to unencumbered use of the land.

6

way ends, and the landowners' rights to unencumbered use of their property are restored. *See id.* at 1228-29.

The first inquiry in any Rails-to-Trails case, therefore, is whether plaintiffs owned the property underlying those segments of the railroad which were acquired by easement. *Ellamae Phillips Co. v. United States*, 564 F.3d 1367, 1373 (Fed. Cir. 2009) (citing *Preseault v.United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996) (en banc) ("*Presault II*")). If the railroad owns a fee interest, then of course the landowners have no expectations.

If the original instrument was an easement, however, then the landowners must demonstrate that the scope of the railroad's easement was exceeded by the issuance of the NITU. If the recreational trail "could not be justified under the terms and within the scope of the existing easements for railroad purposes," the trail would impose "a new easement for [a] new use, constituting a physical taking of the right of exclusive possession that belonged to the [plaintiffs]." *Presault II*, 100 F.3d at 1550. Even if the scope of the easement was not exceeded, plaintiffs can still succeed if, under state law, the railroad's easement had been abandoned prior to the issuance of the NITU. *Ellamae Phillips*, 564 F.3d at 1373. Plaintiffs here have decided, for the present, not to pursue an argument based on prior abandonment.

After suit was initiated, plaintiffs themselves concluded that some of the class "own land abutting a railroad right-of-way in which the railroad acquired a fee interest." Pls.' Mot. to Dismiss 1.[8] Plaintiffs therefore moved to voluntarily dismiss without prejudice pursuant to Rule 23(e) those individuals identified in Exhibit A of plaintiffs' motion. Defendant includes those same individuals within its motion for summary judgment, contending that they should be dismissed with prejudice and that Rule 23(e) contemplates dismissal only "for settlements of class action claims or perhaps the voluntary dismissal of an entire class action." Def.'s Br. 15.[9] We agree with defendant. The facts are not in dispute. These plaintiffs own land adjoining a railroad fee,

---

[8] "Pls.' Mot. to Dismiss" refers to Plaintiffs' Motion to Dismiss Certain Plaintiffs' Claims.

[9] "Def.'s Br." refers to United States' Cross-Motion for Summary Judgment and Memorandum in Support and in Opposition to Plaintiffs' Motion for Partial Summary Judgment.

and they should be dismissed with prejudice, both under plaintiffs' motion to dismiss and defendant's motion for summary judgment.

With respect to the plaintiffs who own land underlying an easement acquired through a State of Utah Patent, we conclude that it is not possible, at least for the present, to enter summary judgment for either party. That transfer granted a "right of way" to the predecessor railroad without any further limiting language as to the purpose. Pls.' Pr. Findings Ex. G at PL00896. The parties disagree as to the import of this document. Defendant contends that the grant is broad enough to encompass trail use. Plaintiff contends it should be limited to a railroad purpose, as that was the use to which it was initially put.

The cases cited by the parties do not provide any clear resolution. *See Clawson v. Wallace*, 52 P. 9, 10 (Utah 1898) ("The right of travel over another's land may be denominated an 'easement' or 'right of way.' . . . A contract for a right to pass over the land of another is an easement, extending only to a temporary disturbance of the owner's possession."). *But see Rio Grande W. Ry. Co. v. Salt Lake Inv. Co.*, 101 P. 586, 589 (1909) (determining the dimensions, not purposes, of a right-of-way granted to a railroad and stating that a right-of-way "ordinarily mean[s] a strip of ground used or occupied by the railroad company for its track and matters directly connected therewith"). Even if the term "right of way" is clear, it is unclear as a matter of Utah law as to whether a right-of-way granted to a railroad is one limited to railroad purposes. Furthermore, Utah law provides that the court will look to extrinsic evidence if the terms in a deed are ambiguous. *See Dansie v. Hi-Country Estates Homeowners Ass'n*, 92 P.3d 162, 166 (Ct. App. Utah 2004) (affirming trial court's examination of easement use when terms of easement were ambiguous); *see also WebBank v. Am. Gen. Annuity Serv. Corp.*, 54 P.3d 1139, 1145 (Utah 2002) ("If the language of the contract is ambiguous such that the intentions of the parties cannot be determined by the plain language of the agreement, 'extrinsic evidence must be looked to in order to determine the intentions of the parties.'") (citing *Cent. Fla. Invs., Inc., v. Park W. Assocs.*, 40 P.3d 599, 605 (Utah 2002)). While both sides have presented collateral evidence as to the use made of the parcel or with respect to how it was referred to in official documents, none of this clearly satisfies either sides' burden on summary judgment. We view it as a mixed question of fact and law as to which there has not been sufficient proof to eliminate the need for trial. We therefore deny both parties' motions for summary judgment in this respect, without prejudice to reassertion on further proof.

This leaves us with four instruments clearly creating easements limited to railroad use. Such instruments consistently have been held not to permit interim trail use or railbanking.[10] Defendant does not cite to any directly contrary Utah law.[11] Liability would thus appear to be established here. The railroad is gone; a recreational trail appears in its place, and the trail was sanctioned by a NITU issued by the federal government. But for the NITU the trail would not be present, and the railroad use would have been extinguished. Or so it might appear.

Defendant contends, however, that this case is different than other Rail-to-Trails cases because the railroad easement was split into two interests, and one was purchased by the trail provider prior to the NITU. This division of interests pursuant to a "State of Maine transaction," was first approved by the STB's predecessor, the Interstate Commerce Commission ("ICC"). *See Maine Dep't of Transp.*, 8 I.C.C.2d 835 (1991); 49 U.S.C. § 702. In *Maine*, the state

---

[10] *Toews v. United States*, 376 F.3d 1371, 1379 (Fed. Cir. 2004) (California); *Presault II*, 100 F.3d at 1542-44 (Vermont); *Thomas v. United States*, No. 10-54L & 10-549L, 2012 WL 3800764, at *16-19 (Fed. Cl. August 29, 2012) (Tennessee); *Ellamae Phillips Co. v. United States*, 99 Fed. Cl. 483, 486-87 (2011) (common law and federal statutes); *Anna F. Nordhus Family Trust v. United States*, 98 Fed. Cl. 331, 338-39 (2011) (Kansas); *Macy Elevator, Inc., v. United States*, 97 Fed. Cl. 708, 733-34 (2011) (Indiana); *Rogers v. United States*, 90 Fed. Cl. 418, 432-33 (2009) (Florida); *Glosemeyer v. United States*, 45 Fed. Cl. 771, 779-81 (2000) (Missouri).

[11] We reject defendant's "shifting use" argument. There is no sound basis in Utah law to argue that trail use and railbanking are permissible as a shifting use of an easement otherwise limited to railroad purposes, for trail use is a new burden, so different from railroad purposes that the original parties would not have contemplated it as within the original grant. *See Stern v. Metro. Water Dist. of Salt Lake & Sandy*, 274 P.3d 935, 953 (Utah 2012) (stating that a proper shifting use is a reasonable improvement that does "not materially alter the burden on the servient estate") (citing *Valcarce v. Fitzgerald*, 961 P.2d 305, 312-13 (Utah 1998)); *see also Presault II*, 100 F.3d at 1543 (rejecting the shifting use argument and noting that "there are differences in the degree and nature of the burden imposed" from trail use); *Toews*, 376 F.3d at 1379 ("[A] public transportation easement defined as one for railroad purposes is not stretchable into an easement for a recreational trail and linear park for skateboarders and picknickers . . . .").

department of transportation purchased the physical assets of the operating railroad. The railroad retained common carrier obligations, however, through an easement. *Id.* at 835-36. The ICC accepted the argument by the state that the transaction was exempt from ICC supervision because the state would not be acquiring a "railroad line" within the meaning of 49 U.S.C. § 10901 (1988), *amended by* 49 U.S.C. § 10901 (Supp. II 1996). *See id.* at 836-38. Further, the state asserted that it had "no intention or ability to assume" common carrier operations, that state law would not allow it to operate as a common carrier, and that the state would only acquire railroad assets which would not interfere with the railroad's continuing freight obligations. *Id.* The ICC accepted the assertion that these facts brought the transaction out from the jurisdiction of the ICC.[12] *Id.* at 838. The lesson defendant gleans from this decision is "that railroads can divide their railroad easements so that an acquirer may purchase an easement for passenger rail operations while the railroad retains an easement to conduct freight rail operations." Def.'s Br. at 7.

Defendant uses these unique facts to make two arguments. First, it contends that the transaction militates against finding that any taking occurred. Unlike the typical circumstance, here, Union Pacific transferred the easement to UTA *prior to* the trail agreement. At the time of the later exemption application, in other words, UTA already owned all of Union Pacific's rights under the easement, except the right to operate a freight line. The exemption application later cleared away that remaining obligation of the railroad and merely freed up the entire right-of-way for trail use, according to defendant.

---

[12] With a caveat:

> We emphasize that this determination is based upon the specific facts of this particular transaction. We caution that any similar transactions should likewise be submitted to us in advance . . . for a jurisdictional determination. Because of the significant possibility that this sort of transaction could affect the carrier's ability to meet its common carrier obligations, unless there are adequate protections built into the transaction, we intend to examine these transactions closely and will make a determination based on the facts and circumstances of each case.

8 I.C.C.2d at 838.

The implication defendant wishes to convey is that the NITU did not make the trail possible, because the bulk of the railroad's rights under the easement had already been transferred. The further implication intended is that UTA could have operated a trail at any time it wished, even without the blessing of the STB. The NITU, in other words, did not trigger a taking. If there was a taking, the relevant actor was the state of Utah when it built the trail.

The second respect in which this case is different, according to defendant, is an extension of the first point. The distinction lies in the fact that the freight easement obtained by UTA as part of the exemption application and issuance of the NITU is narrower than the original railroad easement. Defendant makes the clever argument that, even if there is a taking here, it could consist only of the 25 feet wide freight easement. The transfer of the passenger easement, asserts defendant, occurred prior to the federal actions here and persists after the trail was put in place. This affects damages, according to defendant, because both the before and after values of the plaintiffs' land must take account of the continued presence of the remaining passenger easement on the entire original easement, and specifically, between the outer edges of the freight easement and the furthest edges of the original easement.

We reject both theories. As to the first, that the NITU did not trigger any taking at all, defendant argues:

> the subsequently-issued NITU could only affect the Freight Easement because the Passenger Easement is outside the STB's regulatory jurisdiction. It follows that when the NITU was issued, Plaintiffs' lands were burdened by the Passenger Easement. After the NITU was issued, Plaintiffs' lands continued to be burdened by the Passenger Easement. Simply stated, on the specific facts of this case, the issuance of the NITU did not prevent Plaintiffs from regaining unencumbered fee title to the portion of their lands that had been subject to a railroad easement since the late 1800's.

Def.'s Br. at 17.[13]

---

[13] As defendant points out, plaintiffs have, for the time being, elected not to claim that the entire easement was abandoned prior to issuance of the NITU.

The assumption behind defendant's argument is that because the railroad fractured the original easement into two components, one including all rights, but subject to the second, which consisted only of the right to run freight service, that STB's later actions with respect to the "freight easement" have no consequence for the landowners' reserved rights. Whatever burden was imposed by the transfer of the easement (less the freight easement) already existed.

We disagree. There was only one easement granted to the railroad initially. While the railroad presumably could sell the right to use all or part of that easement, those "sub-easements" would have to be consistent with railroad use. *See generally Wood v. Ashby*, 253 P.2d 351, 354 (Utah 1952) ("A right of way founded upon deed or grant is limited to the uses of the extent thereof as fixed by the grant or deed.") (citing *Nielson v. Sandberg*, 141 P.2d 696 (Utah 1945)). From the perspective of the landowners, the sum of individual sub-easements cannot impose a greater burden than the original easement. *See* Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 9:9 (2001) ("[A]n easement in gross may be divided and may be utilized independently by its holders when such apportionment does not place an additional burden on the servient estate."); *cf.* 7 *Thompson on Real Property* § 60.07(c)(4) (David A. Thomas, ed., 2d ed. 2006) (stating that courts differ on whether an easement in gross is apportionable at all because it could "lead to overburdening of the servient tenement"). The landowners can insist on adherence to the limitations inherent in the original easement. *See Lutheran High Sch. Ass'n of the Greater Salt Lake Area v. Woodlands III Holdings, LLC*, 81 P.3d 792, 795 (Utah Ct. App. 2003) (affirming trial court injunction that prevented misuse of an easement).

As we explain above, the trail is inconsistent with the original easement, thereby voiding the entire easement, not just a portion. Moreover, while misuse of an easement can normally be prevented by injunction, *see id.*, that is not possible here because of preemption by federal law. *See Presault II*, 100 F.3d at 1551 (citing *Trs. of the Diocese of Vt. v. State*, 496 A.2d 151 (Vt. 1985)). When the misuse is inseparable, the proper remedy may be extinguishment of the entire easement. *See Lutheran*, 81 P.3d at 795 n.2 (noting that the trial court could revisit the injunction and extinguish the entire easement if the misuse was inseparable from proper uses of the easement).

Termination is proper because the misuse makes it impossible to achieve the easement's original purpose. *Macy Elevator, Inc. v. United States*, 105 Fed. Cl. 195, 202 (2012) (finding that trail use caused a termination of the

railroad easement because the authorized use was no longer possible) (citing *Selvia v. Reitmeyer*, 295 N.E.2d 869, 874 (Ind. Ct. App. 1973)). Defendant does not suggest that the trail use would coexist with operation of a freight line, and indeed subsequent actions here (the merger of interests and application for exemption with respect to the common carrier obligations) demonstrate there was never any expectation that the trail would be constructed until all the steps had taken place to achieve a unity of title in the trail user.[14] When the original purpose of an easement becomes impossible to achieve, the easement terminates. *See* 7 *Thompson on Real Property* § 60.08(a)(3) ("If changed conditions make it impossible for an easement to fulfill its purpose, the easement may terminate."); *see also The Law of Easements & Licenses in Land* § 10:8 ("An easement created to serve a particular purpose ends when the underlying purpose no longer exists."). So long as the freight obligations continued, the jeopardy to the easement was not imminent. When the NITU was issued, the original purpose of the easement could not be fulfilled.

Defendant's argument that there is no "but for" relationship between the NITU and trail use is therefore clearly wrong. After the Agreement but before the NITU, there was no trail, and one could not have been built without running afoul of the STB's jurisdiction. The reason a trail now exists is that Union Pacific subsequently was relieved of its common carrier obligations as part of the notice of exemption process, which in turn was capped by the NITU. But for the NITU, there could be no trail, which materialized after the issuance of that order.

Defendant's second argument is that the "State of Maine transaction" aspects of this case have implications for damages calculations. Namely, that we must take into account the continued existence of the easement for passenger service. Plaintiffs counter that we must calculate damages based on a methodology which determines the difference between the value of plaintiffs' lands unencumbered by any right-of-way and the value of the land encumbered by the new easement for a recreational trail.

---

[14] As the ICC cautioned, "State of Maine transactions" run the risk of drawing into question the viability of the common carrier obligations of the railroad. *Maine*, 8 I.C.C.2d at 838. Plainly if the trail were constructed before an exemption proceeding, the railroad would have abandoned its common carrier obligations without permission.

We accept plaintiffs' methodology. The attempt to preserve a passenger easement for railroad use was ineffective. As in any other Rails-to-Trails case, we determine the "'state law reversionary property rights that would otherwise vest'" but "'are blocked from so vesting'" by the NITU. *Raulerson v. United States*, 99 Fed. Cl. 9, 12 (2011) (quoting *Barclay v. United States*, 443 F.3d 1368, 1374 (Fed. Cir. 2006)). We do not look at the difference between the value of the property before the issuance of the NITU and the value of the land with the added burden of the trail easement. *See id.* The before value must reflect the value of the land without an easement of any kind because, but for the federal action, plaintiffs would have recovered the full use of their property as a result of the termination of the easement by contrary trail use. *See Macy Elevator, Inc.*, 105 Fed. Cl. at 199 (holding that the before condition of plaintiffs' land was the value of exclusive possession because that was the right belonging to the owners, but for the "continued imposition of trail use pursuant to the NITU"); *see also Ybanez v. United States*, 102 Fed. Cl. 82, 87 (2011). In other words, the NITU extinguished not just part of an easement but the whole easement.

CONCLUSION

For the reasons set out above, defendant's motion for summary judgment is denied in part and granted in part. Those plaintiffs listed on Exhibit A to Plaintiffs' Motion to Dismiss Certain Plaintiffs' Claims of February 2, 2012 are dismissed with prejudice. Plaintiffs' motion for summary judgment is granted in all respects, except as to lands adjoining the State of Utah Patent. The parties are directed to consult with each other and propose further proceedings in a joint status report to be filed on or before December 14, 2012.

                                                    s/ Eric G. Bruggink
                                                    Eric G. Bruggink
                                                    Judge